# United States Court of Appeals

## For the Eighth Circuit

_____

No. 25-1131

_____

United States of America

*Plaintiff - Appellee*

v.

Baling N. Dat

*Defendant - Appellant*

_____

No. 25-1198

_____

United States of America

*Plaintiff - Appellee*

v.

Jany Jock

*Defendant - Appellant*

_____

No. 25-1199

_____

United States of America

*Plaintiff - Appellee*

v.

Dilang Dat

*Defendant - Appellant*
_____

No. 25-1246
_____

United States of America

*Plaintiff - Appellee*

v.

Dilang Dat

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: February 11, 2026
Filed: July 9, 2026
_____

Before COLLOTON, Chief Judge, BENTON and KELLY, Circuit Judges.
_____

BENTON, Circuit Judge.

Baling N. Dat appeals his criminal convictions for possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1); possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and possession of a firearm as a prohibited person, in violation of 18

U.S.C. §§ 922(g)(1), 924(a)(2). Dilang N. Dat appeals his criminal conviction for possession of a firearm as a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). And, Jany G. Jock appeals his criminal conviction for selling or otherwise disposing of a firearm to a felon, in violation of 18 U.S.C. §§ 922(d)(1), 924(a)(2). They collectively challenge the district court's[1] admission of conspiracy and gang-related evidence. Baling separately argues that the district court erred in denying his motions to suppress and sever. Dilang and Jock appeal the denial of their motions for acquittal. Finally, Baling and Dilang appeal their sentences. Having jurisdiction under 18 U.S.C. § 1291, this court affirms.

## I.

Around December 2021, a citizen told the Omaha Police that drugs and firearms were inside 4704 Ellison Avenue, and that drugs were sold there. Police knew Baling and Dilang resided there, and that they were convicted felons and Trip Set gang members.

Police were investigating the Trip Set gang for drug possession, sales, overdoses causing death, and violent crimes. The investigation included 4704 Ellison. Two months before the citizen's tip, Goa N. Dat, a resident there and brother of Baling and Dilang, was murdered in a shooting. Detective David D. Ullery, a part of the Gang Intelligence Unit, swore that additional assaults and violent crimes followed Goa's death.

Responding to the citizen's tip, Officer Jerrod Galloway pulled the trash from 4704's driveway on trash-pickup day, January 21, 2022. Detectives Ullery and Brandon Braun searched the two trash bags, finding: marijuana residue between two cups; a torn-off piece of a ziplock baggie; and four unfired 9 mm bullets stuffed inside two nitrile gloves. The marijuana residue tested positive for THC.

---

[1]The Honorable Brian C. Buescher, United States District Judge for the District of Nebraska.

Based on Detective Ullery's affidavit, a no-knock search warrant was issued for 4704 Ellison. Five days later, a SWAT team executed it, encountering Baling, Dilang, Jock, and others.

In Baling's room, officers found two firearms (a Glock 23 Gen4 and a Sig Sauer P365), loaded magazines, ammunition, thousands of dollars, and a fanny pack. The fanny pack had 12.8 grams of cocaine, several baggies, and three digital scales with white powder on their surfaces. DNA found on the two firearms matched Baling's.

In Dilang's room, they found a Ruger-57 handgun, loaded magazines, and ammunition tied off in a nitrile glove. The Ruger-57 had "no fingerprints" and "a very low amount of DNA," excluding Dilang and Baling as the contributors. At trial, the government used the Ruger-57's location in Dilang's room and photos of Dilang handling it to suggest the firearm was wiped.

In Jock's room, they found a loaded Glock 19 Gen4, two boxes of ammunition, magazines, nitrile gloves, and sales records for the Glock 19 and a Glock 43 Gen4. Only one of Jock's fingerprints was on the Glock 19 despite photo evidence of Dilang handling it. At trial, Nyot M. Pan, the defendants' friend, testified he bought the Ruger-57 and left it with Jock. The boxes of ammunition contained 5.7x28mm rounds, compatible with only the Ruger-57. One box was missing 25 rounds. One magazine in Dilang's room was loaded with 21 rounds with the 5.7x28mm headstamp. Police later learned that Jock purchased the Glock 23 found in Baling's room.

Officers seized the defendants' phones, finding: text messages between the defendants (and others) about buying, possessing, and sharing firearms; images and video of Baling and Dilang with firearms; search histories about firearms and straw purchases; and location data showing Jock purchased firearms.

After an eight-day trial, the jury found Baling guilty of possession with intent to distribute cocaine; possession of a firearm in furtherance of a drug-trafficking crime; and being a felon in possession of a firearm. The district court sentenced him to 195 months in prison.

The jury found Dilang guilty of being a felon in possession of a firearm. He was then on supervised release. The district court revoked his supervised release, sentencing him to a total of 144 months in prison.

The jury found Jock—a non-felon—guilty of selling or otherwise disposing of a firearm to a felon. The district court sentenced him to 120 months in prison.

II.

Baling argues that the search warrant lacked probable cause.

The Fourth Amendment protects persons and their "houses, papers, and effects against unreasonable searches and seizures" effectuated by the government. **U.S. Const. amend. IV**. *See **Bailey v. United States***, 568 U.S. 186, 192 (2013) (The Fourth Amendment applies to the states through the Fourteenth Amendment.). Fourth Amendment interests are at their zenith in the home. *See **Florida v. Jardines***, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); ***Welsh v. Wisconsin***, 466 U.S. 740, 748 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (citation and quotation omitted)). "The Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission." ***Lange v. California***, 594 U.S. 295, 298 (2021). Warrants require probable cause. **U.S. Const. amend. IV**. Probable cause, however, is "not a high bar." ***United States v. Charles***, 125 F.4th 904, 910 (8th Cir. 2025), *quoting **Kaley v. United States***, 571 U.S. 320, 338 (2014).

"Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Juneau*, 73 F.4th 607, 614 (8th Cir. 2023). For a denial of a motion to suppress, this court "reviews the district court's factual findings for clear error and legal conclusions de novo." *United States v. Norey*, 31 F.4th 631, 635 (8th Cir. 2022). Probable-cause determinations are legal conclusions. *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007). "In reviewing whether a warrant was supported by probable cause, our role is to ensure that the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Tate*, 139 F.4th 678, 682 (8th Cir. 2025) (quotation omitted).

Here, Detective Ullery's affidavit provided a substantial basis for probable cause. True, the citizen's tip, alone, might have been insufficient. *See Alabama v. White*, 496 U.S. 325, 329 (1990) ("[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable.'"), *discussing Illinois v. Gates*, 462 U.S. 213, 237 (1983). *Cf. United States v. Wells*, 223 F.3d 835, 839–40 (8th Cir. 2000) (finding no probable cause where the anonymous caller "did not report any firsthand information or intimate details," the caller's description was "too broad," and the police were able to corroborate only "innocent details"). However, the police corroborated the tip by conducting a lawful trash-pull search. *See California v. Greenwood*, 486 U.S. 35, 41–42 (1988) (holding no Fourth Amendment right to privacy in trash left in public areas); *United States v. Gabrio*, 295 F.3d 880, 882–83 (8th Cir. 2002) ("An informant's tip can be sufficient to establish probable cause if . . . the tip 'is corroborated by independent evidence.'"); *United States v. Thurmond*, 782 F.3d 1042, 1044 (8th Cir. 2015) ("[I]tems found in a trash pull, standing alone, may be sufficient to establish probable cause."), *discussing United States v. Briscoe*, 317 F.3d 906, 908 (8th Cir. 2003).

The citizen's tip and marijuana residue, alone, provided a substantial basis for probable cause. In *Briscoe*, 40 marijuana seeds and 25 stems from a trash pull, *standing alone*, sufficiently established probable cause for a residential search warrant. **Briscoe**, 317 F.3d at 908. While the residue here is less—0.027 grams— it shows recent possession of marijuana (then illegal under both federal and Nebraska law), providing a fair probability that the residence had a larger quantity. *Cf.* **United States v. March**, 91 F.4th 975, 976 (8th Cir. 2024) (finding two marijuana stems from a trash pull sufficient to suggest "ongoing marijuana consumption inside the residence"). The marijuana residue coupled with the citizen's tip sufficiently established probable cause. *See* **United States v. Gonzalez-Rodriguez**, 239 F.3d 948, 951 (8th Cir. 2001) (finding methamphetamine residue from a trash pull *with* a reliable confidential informant's tip sufficiently established probable cause for a residential search warrant); **United States v. Hohn**, 8 F.3d 1301, 1302, 1307 (8th Cir. 1993) (finding drug-related items testing positive for meth from a trash pull *with* a confidential informant's tip sufficient to establish probable cause for a residential search warrant). *Cf.* **March**, 91 F.4th at 976–77 (finding two marijuana stems from a trash pull and an officer's statements that firearms were stored at the defendant's residence sufficient for the *Leon* good-faith exception to apply).

Together with the unfired ammunition in the glove, the torn-off piece of a ziplock baggie (evidence of drug trafficking), the gang-related activity in the area, and Baling's and Dilang's felon status, the issuing judge had a substantial basis to find probable cause. *See* **Thurmond**, 782 F.3d at 1045 (finding an affidavit established probable cause with the defendant's prior criminal history, two marijuana roaches, and smoking materials from a trash pull); **United States v. Smith**, 581 F.3d 692, 694 (8th Cir. 2009) (holding an affidavit established probable cause with the defendant's prior drug conviction and trash-pull evidence revealing "evidence of illegal drug activity"); **United States v. Allebach**, 526 F.3d 385, 387 (8th Cir. 2008) (finding an affidavit established probable cause with cocaine residue and drug paraphernalia from a trash pull). The district court did not err in denying Baling's motion to suppress.

III.

Baling argues that the district court abused its discretion in denying his motion for severance. He bases this on evidence admitted against Jock. At trial, the government introduced logs of Jock's emails to prisoners and his payment to Baling, in order to show Jock knew he was selling or disposing of a firearm to a convicted felon: Baling. These logs indicated that Baling was incarcerated at least 12 days, but showed nothing about the name or nature of his incarceration. Baling claims that Federal Rule of Evidence 403 and *Old Chief* prohibit this evidence, requiring severance of his trial.

Multiple defendants may be tried together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." **Fed. R. Crim. P. 8(b)**. "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). If joinder appears prejudicial, the district court may "sever the defendants' trials." **Fed. R. Crim. P. 14(a)**. This court reviews the district court's denial of a motion for severance for an abuse of discretion. *United States v. Warfield*, 97 F.3d 1014, 1018 (8th Cir. 1996).

A district court can abuse its discretion in denying severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. "Only in an unusual case . . . will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." *United States v. Huggans*, 650 F.3d 1210, 1221 (8th Cir. 2011). To show the "severe or compelling prejudice"—necessary for an abuse of discretion— a defendant must "affirmatively demonstrate that the joint trial prejudiced his right to a fair trial." *Warfield*, 97 F.3d at 1018. Because Baling, Dilang, and Jock were "jointly indicted on similar evidence from the same or related events," Baling must show "something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *United States v. Oakie*, 12 F.3d 1436, 1441

(8th Cir. 1993). Baling must show that "his defense was irreconcilable with that of the codefendant or that the jury was unable to compartmentalize the evidence." *United States v. Casteel*, 663 F.3d 1013, 1018 (8th Cir. 2011).

Baling can show neither. He fails to demonstrate any prejudice was "substantial enough to outweigh the general efficiency of joinder." *See id.* at 1019. The government presented overwhelming evidence to show Baling committed the crimes charged only against him. This independent evidence, not the mention of Baling's incarceration, supported the jury's verdict. Even if prejudice existed here, Rule 14 "does not require severance"; "rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *See Zafiro*, 506 U.S. at 538–39. The district court limited any risk of prejudice with its instructions:

> As you know, there are three defendants in this trial: Baling Dat, Dilang Dat, and Jany Jock. Each defendant is entitled to have his case decided solely on the evidence which applies to him. Some of the evidence in this case may only be considered against fewer than all defendants; you may not consider that evidence against the other defendant or defendants.
>
> . . . .
>
> You will hear evidence that multiple defendants were previously convicted of a crime because that is an element of multiple offenses charged in the Superseding Indictment. This evidence, however, does not mean that the defendant committed any of the crimes charged in this case. You may not consider any defendant's prior conviction as evidence that he committed any of the charged offenses in this case.

*See id.* at 539 (stating limiting instructions "often will suffice to cure any risk of prejudice"). This case is not unusual enough "to outweigh the general efficiency of joinder." *See Huggans*, 650 F.3d at 1221; *United States v. Davis*, 534 F.3d 903, 917 (8th Cir. 2008) (stating an argument that "some of the evidence admissible against one of the defendants was damaging to" the rest "is not enough to require separate trials"); *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996)

-9-

("Severance is not required merely because evidence which is admissible only against some defendants may be damaging to others . . . .").[2]

Baling believes that the *Old Chief* case prohibits the mention of his incarceration. Generally, a criminal defendant may not, through a Rule 403 objection, "stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." ***Old Chief v. United States***, 519 U.S. 172, 186–87 (1997). *Old Chief*, however, is a narrow exception: A district court abuses its discretion if it admits evidence of the "name or nature" of the defendant's prior conviction for the purpose of proving only felon status where the defendant is willing to stipulate to that fact. *See **id**.* at 191–92. Baling thinks that, absent joinder, his felon-status stipulation would have foreclosed the mention of his incarceration. *See **Zafiro***, 506 U.S. at 539 (Severe prejudice "might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.").

*Old Chief*, however, does not apply here because any facts beyond Baling's felon status were not introduced to prove Baling was a felon, but to show Jock's mens rea. *See **United States v. Hill***, 249 F.3d 707, 713 (8th Cir. 2001) (stating "the limited rule of *Old Chief* disappears," if the defendant's previous crime is introduced for any reason other than showing his status as a felon). "[A]bsent the unusual circumstance of prior criminal status, the Government is free to offer its evidence as it sees fit." ***United States v. Becht***, 267 F.3d 767, 774 (8th Cir. 2001). The government's mention of incarceration is not what *Old Chief* prohibits. *See **Old Chief***, 519 U.S. at 174, 180.

The district court did not abuse its discretion in denying Baling's motion to sever.

---

[2]Dilang briefly asserts that he was prejudiced by the joint trial. He also fails to affirmatively show severe or compelling prejudice.

IV.

The defendants argue that the district court erred in admitting the government's Exhibit 128, a 78-slide PowerPoint with photos, video, text messages, search histories, and location data from the defendants' phones.

For Baling, Exhibit 128 revealed text messages from February 2020 to October 2021 about the communal sharing of firearms, along with photos of him in nitrile gloves, dual wielding firearms.

For Dilang, Exhibit 128 displayed the following text messages he sent from October 2020 to January 2022:

- "What you got on the burner we need a good gun case [s__t] go left!";

- "Just pull up.  I got a glock on me";

- "Yup!  We have to get an apartment & glocks today?";

- "I was just about to order that money bag and buy Bros Glock with the jug money.";

- "I wanna grab this glock tonight but it's 600 loan me 400 an I'll give it back Friday?";

- "Loan me 1k I gotchu back Oct. 29th?  (You can hold the Glock until I give your money back)";

- "I ain't going there wit out the pole";[3]

- "I gotchu, but I'm lit an i won't get in traffic without the gun";

---

[3]Explained at trial as a reference to a "firearm."

- "I'll be hitting the gun store then that same location from yesterday.";

- "Can I put my gun up";

- "Can you spot me $500 so I can get this switch for my glock?"

Dilang messaged Jock, "This [n____a] Reese sent bread so you can grab the ammo! An this [n____a] Jay sent bread and wants me to put a ticket in for him can you help me?" Other messages revealed Dilang's involvement in the communal sharing of firearms. The Exhibit's slides also showed images from Dilang's phone of firearms, him possessing the Ruger-57 and Glock 19, and using Trip Set gang hand signs.

For Jock, Exhibit 128 displayed his messages from July 2020 to January 2022. As discussed, prison communication and payment logs (independent of Exhibit 128) showed that he knew Baling was a prohibited person. Knowing this, Jock messaged Baling, "Ya gonna grab the pole?" Dilang messaged Jock about his parole-mandated drug test, suggesting Jock also knew about his prohibited status. A few months after this text, Dilang messaged Jock, "looks like we buying weapons this weekend." Other messages highlighted Jock's part as a purchaser of firearms in the communal-sharing conspiracy. One image from Jock's phone showed Baling passing a firearm to the photographer. Another showed nitrile gloves in Jock's room. The Exhibit revealed Jock's search history, including searches for firearms, drum magazines, and: "How to prove a straw purchase"; "what happens after you buy a gun"; "Straw purchase investigation"; "can police come to home to verify gun is there"; "straw purchase"; and "Straw purchase convictions." Exhibit 128 also used his location data to show he physically purchased firearms.

A.

This court reviews the district court's admission of evidence for an abuse of discretion. *United States v. Sorensen*, 148 F.4th 992, 996 (8th Cir. 2025).

-12-

Defendants argue that the admission of Exhibit 128 violates Federal Rule of Criminal Procedure 16. "Upon a defendant's request, the government must permit the defendant to inspect . . . documents, data, photographs, . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control," and "the item is material to preparing the defense," or "the government intends to use the item in its case-in-chief at trial." **Fed. R. Crim. P. 16(a)(1)(E)**. The night before trial, the government submitted Exhibit 128 to the court and defendants. The government attributed the late submission to working on the Exhibit until the eve of trial, adding it was uncertain if the case was going to trial. The district court, at a hearing, believed the government's explanation. Excusing the violation of its scheduling order, the district court admitted Exhibit 128 as substantive evidence under Federal Rule of Evidence 1006. The defendants assert that the late submission denied them the opportunity to review content "material to preparing the defense" that the government used "in its case-in-chief at trial." *See id*.

The district court's admission of Exhibit 128 did not violate Rule 16. Over two years earlier, the government gave the underlying data to the defendants. While the district court was initially concerned with the late submission, it later stated, "I'm very confident that the attorneys who reviewed the cell phone data would have [seen] these photos and these texts and underst[oo]d that that's absolutely something the government would focus on." The district court also found that reviewing Exhibit 128 was not an "onerous task" because each slide showed a Cellebrite link identifying the data's location in the phones. Importantly, the defendants never moved for a continuance (despite their previous requests for other reasons), vitiating their claim of prejudice. *See **Patterson v. F.W. Woolworth Co.***, 786 F.2d 874, 879–80 (8th Cir. 1986) ("[A]ny claim of prejudice or surprise is vitiated by plaintiffs' failure to request a continuance."). The district court did not abuse its discretion in admitting Exhibit 128 over the defendants' Rule 16 objections. *See **United States v. Maloney***, 102 F.4th 904, 915–16 (8th Cir. 2024).

B.

"This court reviews de novo the district court's interpretation and application of the rules of evidence, and reviews for an abuse of discretion the factual findings supporting its evidentiary ruling." *American Mod. Home Ins. Co. v. Thomas*, 993 F.3d 1068, 1071 (8th Cir. 2021).

Defendants argue that Exhibit 128 is not a summary under Rule 1006. "The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." **Fed. R. Evid. 1006(a)**. "Summaries are properly admissible when (1) they fairly summarize voluminous trial evidence; (2) they assist the jury in understanding the testimony already introduced; and (3) the witness who prepared it is subject to cross-examination with all documents used to prepare the summary." *United States v. Fechner*, 952 F.3d 954, 959 (8th Cir. 2020). "[T]he evidence summarized within it need[] only [] be admissible, not already admitted." *Id*.

Exhibit 128 is admissible as a summary. The defendants' phones had several gigabytes of information. The final version of Exhibit 128 compiled relevant and accurate data from the phones, summarizing voluminous evidence. The slides circled certain text messages and search histories. For the text messages, the left side of the slides re-stated the circled texts in a larger font, with the date, sender, and recipient. Other slides had short descriptions for images, or arrows pointing to relevant portions of images. The Exhibit fairly summarized voluminous trial evidence. *See United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001) ("A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case."); *Wright & Miller*, **Federal Practice and Procedure § 8044**, at 549 ("Since a summary by its very nature leaves out portions of the source material, accuracy in this context is a relative concept. . . . While parties are permitted to provide [a] summary of favorable evidence, the summary should not include argumentative or otherwise

-14-

unfairly prejudicial matter."); **2 McCormick on Evidence § 241**, at 187 (9th ed.) ("So long as they are accurate, however, such summaries may present only one party's side of the case.").

Exhibit 128 satisfies the other summary elements. It assisted the jury's understanding of the underlying conspiracy between the defendants to unlawfully possess and transfer firearms. Testimony about the conspiracy was introduced before Exhibit 128's admission to the jury. And, Detectives Michael Curd and Kristen Pignotti, who extracted, compiled, and authenticated the phone data, testified at trial and were available for cross-examination.

The district court did not abuse its discretion in admitting Exhibit 128 under Rule 1006. *See Fechner*, 952 F.3d at 959–60 (finding no abuse of discretion in admitting an exhibit summarizing 36 pornographic videos not shown to the jury, providing "the names, the date created, and a brief description"); *United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988) (stating "Rule 1006 does not require that it be literally impossible to examine all the underlying records, but only that in-court examination would be an inconvenience"); *United States v. Dunnican*, 961 F.3d 859, 873 (6th Cir. 2020) (stating "Rule 1006 was designed to govern" scenarios where phone extractions yield a quantity of data "so unwieldy and robust that it would take multiple months . . . for a court to examine").

C.

Defendants challenge the district court's admission of the text messages within Exhibit 128 as co-conspirator statements. While the government here did not charge the defendants with a conspiracy, it presented evidence of one. *See United States v. Zackery*, 494 F.3d 644, 648 (8th Cir. 2007) (stating co-conspirator statements may be admitted as non-hearsay "even in the absence of a conspiracy charge so long as there is independent evidence of concert of action").

-15-

Hearsay is an out-of-court statement used "to prove the truth of the matter asserted." **Fed. R. Evid. 801(c)**. Under Federal Rule of Evidence 801(d)(2)(E), however, statements "offered against an opposing party" that were "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. To admit statements under Rule 801(d)(2)(E), the government must "establish by a preponderance of the evidence . . . 'that there was a conspiracy involving the declarant and the nonoffering party, and the statement was made during the course and in furtherance of the conspiracy.'" *United States v. Mayfield*, 909 F.3d 956, 960 (8th Cir. 2018), *quoting* *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Procedures set forth in *Bell* instruct district courts should conditionally admit alleged co-conspirator statements *after* the defendants invoke *Bell* in their objection, subject to an on-the-record ruling that the statement is admissible under Rule 801(d)(2)(E). *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978). These procedures should "transpire out of the hearing of the jury." *Id*.

Defendants argue that the district court erred in its factfinding and ultimate decision to admit these statements. "[T]he proper standard is to review the district court's Rule 801(d)(2)(E) factfinding for clear error, and then review the ultimate decision to admit or exclude the statement for abuse of discretion . . . ." *Mayfield*, 909 F.3d at 961.

Defendants argue that the district court erred in its Rule 801(d)(2)(E) factfinding. They argue that Exhibit 128 failed to show a conspiracy, and that the statements in the Exhibit were the government's only evidence of a conspiracy. *See United States v. Ramirez-Martinez*, 6 F.4th 859, 867 (8th Cir. 2021) ("[T]he government must produce independent evidence outside of the statements themselves to establish the existence of the conspiracy. Notably, this 'independent evidence' can be 'completely circumstantial.'" (internal citation omitted)). These arguments fail. Overwhelming evidence inside and independent of Exhibit 128 showed that the defendants conspired to unlawfully possess and transfer firearms. The district court did not clearly err in its factfinding.

Defendants also argue that the district court failed to follow the *Bell* procedures. This argument fails because (1) the district court complied with *Bell*, and (2) the defendants were not prejudiced.

Before Exhibit 128's admission, during trial, the district court welcomed the defendants' objections. The defendants raised several hearsay objections to the text messages. Baling, objecting, argued this was "not a conspiracy case," and that the government could not use Rule 801(d)(2)(E). The government responded:

> No. With respect to co-conspirator statements, those can come in. They don't have to be charged as co-conspirators. They're still co-conspirator statements and, in fact, the Indictment alleges that in effect. That Jany Jock transferred a firearm to Baling Dat. So whether or not they're charged in a conspiracy has nothing to do with co-conspirator statements.

Despite this, the defendants neither invoked *Bell* nor requested a *Bell* ruling. The district court then raised concerns about three slides where the individual in the image was unidentifiable. The government agreed to remove these three slides. The district court continued:

> [T]he other evidentiary objections that have been made to specific pages, you know, I'm going to overrule them to the extent that the -- that the United States has agreed to withdraw some of the pages. They are going to take those out, . . . and we'll just tell the jury that due to my ruling some of the pages are out.
>
> . . . .
>
> I'm gonna allow the parties to again object once the . . . exhibit is in final after the United States takes out the pages we've discussed and any other pages they decide to take out after this discussion . . . .

The district court brought back the jury. The trial continued.

-17-

Later during the trial, the district court revisited its Exhibit-128 ruling, stating:

> [R]egarding Exhibit 128, the defendants objected to many of the government's slides. . . . The defendants objected on the grounds of relevance, Rule 403, and Rule 404. The defendants also sought a limiting instruction to the jury to not consider evidence that may be related to a co-defendant when it is unrelated to a certain defendant.
>
> I just wanna note from the outset that in the vast majority of trials such as this, some of the evidence in Exhibit 128, along with many other items of evidence that have already been admitted in this case, generally are not needed and may not be offered and may not be properly proffered because in most of these trials that I presided over -- and actually all of them maybe but this one -- the defendants have entered into stipulations that make such -- certain evidence unnecessary.
>
> Here, we of course have a couple *Old Chief* stipulations but we don't have any other stipulations. And as a result of that, the government has to meet its burden; and the burden it has to meet is -- requires additional evidence that normally doesn't have to come in so I'm just gonna note that. So given the circumstances here, the government feels compelled and I'm -- I'm compelled to consider evidence that many times doesn't need -- doesn't need to be considered and doesn't need to be put into evidence.
>
> . . . .
>
> . . . . Although it would have been optimal if the government had provided the exhibit before the day before trial, there are reasons why they did not. And since it was simply the compilation of evidence already provided, I don't find any prejudice there anyway.
>
> Finally, the last thing I wanna talk about with regard to this. Over the weekend I looked at the exhibits again. . . . [T]he notice of the funeral that was on [slide] 56. I have decided to ask that that slide be removed in addition to the other ones I already stated.

The government agreed to remove the slide. The district court concluded:

> So there's my -- that's all I have to say on that. Okay. So given that, that is my ruling. I've already spent a lot of court time on this exhibit, and *everyone's had an opportunity to address this issue numerous times* so I don't intend to -- to spend any more time on that so -- but I wanna do ask if there's anything besides that issue that the -- that we need to address before bringing in this jury and continuing this trial.

(emphasis added). Defendants mentioned their previous hearsay objections, which the district court found did not affect its ruling. The defendants still neither invoked *Bell* nor requested a *Bell* ruling. The four slides were blacked out.

Later, when the government was authenticating the phone extractions, the defendants argued against the government's use of Rule 801(d)(2)(E), invoking *Bell*. Responding, the government argued that a conspiracy existed, and stated at the close of its evidence it would request a *Bell* ruling. The district court admitted the phone extractions, but did not allow them to go to the jury. The district court added:

> Counsel, one thing that was mentioned in the sidebar is the United States is going to seek to use Federal Rule of Evidence 801(d)(2)(E) as one ground to admit some of the statements that were made in Exhibit 128 which is forthcoming and will be admitted likely unless there's a problem with -- with its admission that's not anticipated.
>
> . . . . And I will intend to conditionally admit such information subject to a final declaration or final decision under *United States v. Bell* with regard to that matter.

After authentication, the government offered Exhibit 128. The defendants made their Rule 801 objections, which the district court overruled. The district court conditionally admitted Exhibit 128, allowing the government to publish it to the jury.

Toward the end of trial, the district court made its *Bell* ruling. It found Exhibit 128 admissible as non-hearsay:

. . . . Here, the government's evidence shows by a preponderance of the evidence that the defendants were members of a conspiracy to unlawfully possess and transfer weapons. The out-of-court statements presented by the government in Exhibit 128 were related to the unlawful transfer, receipt, and possession of firearms that were thus "made during the course of and in furtherance of the conspiracy." Thus, . . . Rule 801(d)(2)(E) applies to the out-of-court statements made by the defendants. Accordingly, these statements are admissible against all defendants.

. . . .

. . . . Evidence of other defendants' possession or transfer of firearms is admissible due to the existence of the conspiracy. As discussed, there is sufficient evidence of an unlawful firearm conspiracy between the defendants, meaning any acts in furtherance of that conspiracy are admissible against the others. . . .

However, the government did not present any evidence of a conspiracy to possess or distribute cocaine. Accordingly, the Court will give a limiting instruction as to the cocaine . . . .

Since the district court conditionally admitted the statements in Exhibit 128 after *Bell*'s invocation, and "made an explicit on-the-record ruling that the government had met its burden and that the challenged statements were admissible," outside the presence of the jury, it complied with the *Bell* procedures. *See **United States v. England***, 966 F.2d 403, 408 (8th Cir. 1992); ***United States v. Craig***, 94 F.4th 752, 756 (8th Cir. 2024). *Cf*. ***United States v. Jorgensen***, 144 F.3d 550, 561 (8th Cir. 1998) ("Prosecutors who offer coconspirator statements under the nonhearsay exception have a duty to protect their record by making sure they request final *Bell* rulings *at the close of all the evidence*." (emphasis added)).

Even if the district court erred in implementing *Bell*, its procedures "are flexible and do not require reversal for failure to follow . . . absent a showing of prejudice." ***Craig***, 94 F.4th at 756. The defendants were not prejudiced by the government's use of Rule 801(d)(2)(E). The government stated its intention to admit

the statements as non-hearsay under the rule, and the text messages raised an obvious co-conspirator-statement issue. As noted, the defendants had ample notice of Exhibit 128's content, and the record shows they had ample opportunity to request a *Bell* ruling and to argue against admission. The defendants were also not prejudiced because the record shows "overwhelming evidence of a conspiracy and that all of the statements were made by co-conspirators in furtherance of the conspiracy." *See United States v. Johnson*, 535 F.3d 892, 897 (8th Cir. 2008).

The district court did not abuse its discretion in admitting Exhibit 128's firearm-conspiracy evidence under Rule 801(d)(2)(E).

D.

Defendants argue that the district court erred in ruling Exhibit 128's contents admissible as intrinsic evidence.

Federal Rule of Evidence 404(b) "excludes evidence of specific bad acts used to circumstantially prove a person has a propensity to commit acts of that sort." *United States v. Guzman*, 926 F.3d 991, 999 (8th Cir. 2019). Rule 404(b) does not apply to intrinsic evidence. *United States v. Payne-Owens*, 845 F.3d 868, 872 (8th Cir. 2017). "Intrinsic evidence tends logically to prove any element of the crime charged, and is admissible as an integral part of the immediate context of the crime charged." *United States v. Dunn*, 76 F.4th 1062, 1067 (8th Cir. 2023) (quotation omitted).

Exhibit 128's content was intrinsic evidence. The text messages, photos, video, search history, and location data supported (1) Baling's and Dilang's ongoing, unlawful possession of firearms, and (2) the conspiracy between the defendants to unlawfully possess and transfer firearms. All this evidence was "inextricably intertwined as an integral part of the immediate context of the crime[s] charged." *See United States v. Rolett*, 151 F.3d 787, 790 (8th Cir. 1998) (quotation omitted); *Guzman*, 926 F.3d at 1000 (stating intrinsic evidence includes "evidence that merely

-21-

'completes the story' or provides context to the charged crime"). The defendants believe that their years' old phone data are propensity evidence and too remote. Baling's and Dilang's "prior possession of a firearm is directly relevant to proving later possession of that same weapon because it helps establish ownership or control of the weapon." *Dunn*, 76 F.4th at 1067 (cleaned up). Jock's search history was integral to showing his guilt in purchasing firearms for prohibited persons. Collectively, Exhibit 128's content tended logically to prove that the defendants were guilty of the crimes charged, and was thus not subject to Rule 404(b). *See id*.

The district court did not abuse its discretion in ruling that Exhibit 128's probative value was not substantially outweighed by the danger of unfair prejudice. *See* **Fed. R. Evid. 403**. While the content was prejudicial in tending to prove the existence of the conspiracy to unlawfully possess and transfer firearms, it was "not unfairly prejudicial because [it was] directly relevant to the charged offenses." *See* ***United States v. Agena***, 138 F.4th 1063, 1070 (8th Cir. 2025).

Exhibit 128's content was also admissible as intrinsic evidence.

## E.

Defendants argue that Exhibit 128 violated their Sixth Amendment Confrontation Clause rights. "The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him." ***Smith v. Arizona***, 602 U.S. 779, 783 (2024). The Confrontation Clause bars only testimonial hearsay statements. *Id*. at 800. The statements in Exhibit 128 were either casual remarks made to acquaintances, or co-conspirator statements made in furtherance of a conspiracy and properly admitted under Rule 801(d)(2)(E). Since these statements are nontestimonial, the Confrontation Clause does not apply. *See* ***United States v. Lee***, 374 F.3d 637, 643 (8th Cir. 2004) ("[C]asual statements to an acquaintance are not testimonial. Nor are statements to a coconspirator . . . testimonial." (internal citation omitted)).

-22-

F.

The district court properly admitted Exhibit 128 under Rule 1006, Rule 801(d)(2)(E), and as intrinsic evidence.

V.

Defendants argue that the district court erred in admitting gang-related evidence, asserting it is irrelevant and unduly prejudicial.

Before trial, the defendants moved for an in limine order prohibiting evidence of their membership in the Trip Set gang, invoking Rule 404(b). The district court ruled that the gang-related evidence was intrinsic, and thus admissible, subject to Rule 403 balancing.

At trial, after the conditional admission of Exhibit 128, Detective Ullery testified as an expert on the Trip Set gang. Before he testified, defendants objected "to any testimony above and beyond what [the district court] ha[d] authorized" in its in limine order. The government responded that Ullery's testimony would provide context to the defendants' conspiracy to unlawfully possess and transfer firearms. The district court overruled the objection, "If you think what happens is going beyond my order, I think you have to object 'cause I don't know unless you object."

Defendants did not object to most of Detective Ullery's testimony. He testified about: the general motives for someone to join a gang; the history of the Trip Set gang; where it operated; crimes associated with it; the gang's colors and hand signs; its terminology; its allies and foes; and that the defendants were members. The defendants objected to the general motives to join a gang for "lack of foundation," which was overruled, and to whether Baling was in the Trip Set gang, which was sustained.

Asked if Dilang and Jock were members of the Trip Set gang, Detective Ullery answered "Yes." For Dilang, Detective Ullery added, "I've seen [him] in various posts [use] Trip Set gang hand signs." For Jock, he added, "Last year on his Facebook when it says a job or works for, it said works for Trip Set." No objections were made about their membership. Baling objected when Detective Ullery testified that at age 13, Baling admitted joining Trip Set. The district court noted the ample evidence of gang membership and gave a limiting instruction, telling the jury not to consider that testimony.

Later, on redirect, the prosecutor again asked if Baling was a member. Detective Ullery answered "Yes." The prosecutor added, "So setting aside any interview that was done, what do you base that on?" Detective Ullery responded, "Prior criminal activity such as what you were saying, act in concert with other individuals that are Trip Set gang members, prison time. Just ongoing investigations where he comes up and others within the Trip Set gang keep coming up." Baling did not object to this testimony. The prosecutor asked, "Is that also true of Dilang?"; and then "Is it for those very same reasons?" Detective Ullery answered both "Yes." Dilang objected to the second question—referencing Rules 401, 403, and 404, as well as his felon-status stipulation—which the district court overruled. A similar sequence occurred for Jock, to which he offered an objection based on Rules 401, 403, and 404. The district court also overruled his objection.

The defendants believe that the admission of any of the gang-related evidence is a reversible error.

This court gives substantial deference to district courts' evidentiary rulings. *United States v. Manning*, 738 F.3d 937, 942 (8th Cir. 2014). Ordinarily, this court reviews these rulings for abuse of discretion. *United States v. Gant*, 721 F.3d 505, 509 (8th Cir. 2013). Failing to properly preserve an error, however, results in plain-error review. *United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc). "To preserve an error for appellate review, an objection must be timely and must clearly state the grounds for the objection." *Id*. (cleaned up). Plain-error review

requires the defendant to show "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id*. at 550, *quoting* **Johnson v. United States**, 520 U.S. 461, 467 (1997). Even if a defendant shows these three elements, this court can exercise jurisdiction over an unpreserved error only if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (citation omitted). To the extent the defendants failed to object, this court reviews for plain error. *See* **United States v. Looking Cloud**, 419 F.3d 781, 785 (8th Cir. 2005).

Gang-related evidence is intrinsic if it establishes a conspiracy or rebuts "codefendants' innocent explanations of their relationships with one another." *See* **United States v. Parker**, 871 F.3d 590, 598 (8th Cir. 2017), *quoting* **United States v. Street**, 548 F.3d 618, 632 (8th Cir. 2008). Gang-related evidence is inadmissible "if its purpose is solely to prejudice the defendant or prove his guilt by association with unsavory characters." **United States v. Ellison**, 616 F.3d 829, 833 (8th Cir. 2010) (quotation omitted). "General evidence as to gang culture, aimed at simply establishing a violent or lawless culture, is often unduly prejudicial and can be irrelevant." **Payne-Owens**, 845 F.3d at 873 (alteration omitted).

Here, there were two types of gang evidence. First was specific evidence of the defendants' gang membership from Exhibit 128 and Detective Ullery's testimony. The second type was general gang evidence that consisted of Ullery's testimony about gangs generally, and the general criminal activities of the Trip Set gang and its members.

A.

The district court did not err, let alone plainly err, under Rule 404(b) in admitting the specific gang evidence. The defendants' Trip Set membership provided "a total picture" for the police's investigation of 4704 Ellison, the search warrant, the defendants' relationship with one another, their phones' content, and their motives to possess and transfer guns and ammunition. *See id*. at 872–73; **United States v. Johnson**, 28 F.3d 1487, 1497 (8th Cir. 1994) ("Specific and

-25-

circumscribed evidence of gang association may be necessary in a trial to show the nature and extent of the defendants' association, which in turn bears on whether they conspired." (cleaned up)). Here, the evidence of the defendants' Trip Set membership was "an *unavoidable incident* of presenting other permissible evidence." *See Street*, 548 F.3d at 632 (emphasis in original). The specific gang evidence "tended to make it more likely" that they conspired to unlawfully possess and transfer firearms and committed the crimes charged. *See Dunn*, 76 F.4th at 1067; *United States v. LaDue*, 561 F.3d 855, 858 (8th Cir. 2009) ("[W]here acts are inextricably intertwined with the charged crime, they are not . . . merely character evidence governed by Federal Rule of Evidence 404(b)."). The specific gang evidence was thus intrinsic to the crimes charged and not subject to Rule 404(b).

The district court also did not err, let alone plainly err, in its Rule 403 balancing for the specific gang evidence. This evidence was highly probative because "it spoke to the key issue[s] at trial." *See Payne-Owens*, 845 F.3d at 874, *discussing Johnson*, 28 F.3d at 1497. Because the primary effect of the gang-related evidence was not to prove guilt by association, but to provide context to disputed issues, the danger of unfair prejudice did not substantially outweigh its probative value. *See Dunn*, 76 F.4th at 1067–68.

The district court did not abuse its discretion in admitting the specific gang evidence.

B.

The general gang evidence is concerning. Asked about the Trip Set gang's activities, Detective Ullery responded, "Robberies, home invasions, burglaries, narcotics trafficking, gun trafficking, felony assaults, homicides, thefts." The prosecutor asked: "And -- and just to be clear, we're talking about the gang, the Trip Set gang in general, we're not ascribing any of that information to the three defendants here; correct?" Detective Ullery responded, "That's correct, yeah, sorry. That's correct. That's just the Trip Set gang." Asked about Trip Set's terminology,

Detective Ullery testified to general gang evidence. He said, in part, "They call themselves Taliban babies. They call themselves Section 8 Taliban. Burt Street Demons." These terms were not otherwise mentioned at trial to prove the defendants' membership. Asked about Trip Set's allies, Detective Ullery identified other Omaha gangs. Asked about their foes, he responded, "Crips for sure. 40th Ave., 44th Ave., Hilltop, Pleasantview Crips." Evidence of Trip Set's general inter-gang relations was not relevant to the case against the defendants, ascribing to them an unnecessary association with unsavory characters. Detective Ullery also provided testimony about the general motives to join a gang. This testimony, unlike the aforementioned, did not go to the violent or lawless culture of gangs.

In *Street*, the government's expert witness, Detective Steve Cook, provided improper testimony about the "the violent, lawless propensities of outlaw motorcycle gangs." *Street*, 548 F.3d at 629. There, half of Cook's testimony was "devoted to an alarming portrayal of gang culture in general and of the local El Forasteros gang in particular." *Id*. His testimony discussed the history and inter-gang relations of biker gangs—going as far back as 1947 and spanning several states—emphasizing their violent nature. *Id*. at 629–30. Cook said some gangs in "the biker community" "will blow each other's vehicles up, shoot, [and] assault" to resolve their issues, ascribing to them generally a territorial, violent nature. *Id*. For the El Forasteros specifically, his testimony labeled them as a group of "misogynistic, hardened outlaws." *Id*. at 631. Importantly, Cook's gang-related testimony was "in great part completely irrelevant." *See id*. at 631–33. It neither related to the criminal charges nor to the particular facts of the case. *Id*. No evidence existed showing that the defendant there had ever been a member of the El Forasteros or any gang. *Id*. The testimony was also excessive and unduly prejudicial. *Id*. Equally important, the *Street* "case was close." *Id*. at 629. "His first trial ended in a hung jury; the second trial ended in acquittal on two of three counts; and in the penalty phase five jurors revealed lingering doubts as to the one count on which Street was convicted." *Id*. at 633. This court thus concluded that the "admission of evidence on gang culture and attitudes" was a reversible error. *Id*.

In *Roark*, this court also found reversible the admission of general gang evidence about a biker gang. *See United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991). There, the witnesses' testimony included: Hells Angels' illegal drug activities; its operation of meth labs; its desire to establish rural drug labs; and its members dealing in meth and cocaine. *Id*. at 1430–31. While the defendant was a member, the gang testimony went not to his guilt, but to the general reputation of the gang. *Id*. at 1433. This court concluded that, despite the district court's limiting instruction, the witnesses' gang testimony was so "relentless" that "the jury could not disregard the entire theme of the trial: guilty by association." *Id*. at 1432–34.

*Street* and *Roark* illustrate that when the gang evidence is so irrelevant and prejudicial that it permits the factfinder to adjudge the defendants guilty by association, its admission is a reversible error. *See Street*, 548 F.3d at 629–33; *Roark*, 924 F.2d at 1430–34; *United States v. J.H.H.*, 22 F.3d 821, 828–30 (8th Cir. 1994). The admission of the unobjected-to general gang evidence here, however, is not plain error.

Detective Ullery's testimony about Trip Set's criminal activities, unsavory terminology, and its inter-gang relations did not affect the defendants' substantial rights. To satisfy the substantial-rights element of plain-error review, the defendants must demonstrate "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 593 U.S. 503, 507–08 (2021) (citation omitted). "The defendant[s] ha[ve] the burden of proving plain error, whereas the government has the burden of proving harmless error." *Pirani*, 406 F.3d at 550. *See also Greer*, 593 U.S. at 512 (stating "unpreserved errors must be analyzed for plain error"); *United States v. Sledge*, 108 F.4th 659, 668 n.2 (8th Cir. 2024) ("Under both plain error and harmless error, the ultimate inquiry requires a determination as to whether the error affected substantial rights . . . ." (quotation omitted)).

The general gang evidence, while irrelevant to the defendants, did not shift the theme of the trial to guilt by association. In *Gaines*, this court found the district

court did not abuse its discretion in admitting expert testimony about how gangs generally "are involved in illegal activity and members often possess firearms." ***United States v. Gaines***, 859 F.3d 1128, 1132 (8th Cir. 2017). This court emphasized there the general gang evidence's brevity, its placement within a limited amount of admissible gang evidence, and that the evidence was "well known." ***Id***. While Detective Ullery's general gang testimony was specific to Trip Set, raising the risk of prejudice, it was brief relative to his total testimony and the eight-day trial. And, while Detective Ullery's erroneous statements were situated within a fair amount of admissible gang evidence, the probative value of that evidence, unlike *Gaines*, was strong. *Cf. id*. at 1133. *See **Johnson***, 28 F.3d at 1497–98. Unlike *Roark*, the culmination of the gang-related evidence here was not a "relentless attempt" to convict the defendants through their association with the Trip Set gang. *Cf. **Roark***, 924 F.2d at 1430–34. Rather, evidence of the defendants' membership provided significant context to the charged crimes and the underlying conspiracy. *See **Payne-Owens***, 845 F.3d at 872. Also, unlike *Street*, this case was not close. *Cf. **Street***, 548 F.3d at 629–31. Overwhelming evidence—independent of Detective Ullery's general gang testimony—established the defendants' guilt beyond a reasonable doubt. *See **J.H.H**.*, 22 F.3d at 829 (collecting cases) ("The improper admission of evidence will be deemed harmless if sufficient admissible evidence exists in the record to establish the defendant's guilt beyond a reasonable doubt without consideration of the inadmissible evidence."). The defendants cannot show a reasonable probability that, absent Detective Ullery's general gang testimony, they would have been acquitted. The district court thus did not plainly err in admitting the general gang evidence.

The district court neither abused its discretion in admitting the specific gang evidence, nor plainly erred in admitting Detective Ullery's general gang testimony.

## VI.

Dilang and Jock argue that the district court erred in finding sufficient evidence to convict.

"When determining whether the evidence is sufficient to support a conviction, we view the evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences." ***United States v. Carter***, 270 F.3d 731, 734 (8th Cir. 2001). "Sufficiency review essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.'" ***Musacchio v. United States***, 577 U.S. 237, 243 (2016), *quoting* ***Burks v. United States***, 437 U.S. 1, 16 (1978). Thus, this court will reverse on sufficiency grounds "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." ***United States v. Thomas***, 877 F.3d 1077, 1079 (8th Cir. 2017).

Viewing the record most favorably to the verdict, there was overwhelming evidence for Dilang's and Jock's convictions. A reasonable jury could have found them guilty beyond a reasonable doubt. The district court did not err in denying their motions for acquittal.

## VII.

Baling and Dilang challenge their sentences.

## A.

The jury found Baling guilty of possession with intent to distribute cocaine (Count I); possession of a firearm in furtherance of a drug-trafficking crime (Count II); and being a felon in possession of a firearm (Count III). The district court sentenced Baling to 135 months' incarceration on Count I; 120 months' incarceration on Count III to run concurrently with Count I; and 60 months' incarceration on Count II to run consecutively to all other counts.

Baling argues that the district court erred in its application of a four-level enhancement. This court review's an "interpretation of the Sentencing Guidelines

-30-

de novo and a district court's application of the Guidelines to the facts for clear error." ***United States v. Acosta***, 619 F.3d 956, 961 (8th Cir. 2010).

The firearm-trafficking enhancement applies if the defendant:

(i) transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and

(ii) knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual

(I) whose possession or receipt of the firearm would be unlawful; or

(II) who intended to use or dispose of the firearm unlawfully.

**U.S.S.G. § 2K2.1 cmt. n. 13(A) (2021)**. Baling asserts that there was insufficient evidence to support the enhancement, believing the government failed to prove anything beyond his unlawful possession of two firearms. While he emphasizes he was not charged with trafficking firearms, or a conspiracy to do so, "[t]he district court may consider uncharged, dismissed, and even acquitted conduct at sentencing," so long as it is relevant. ***United States v. Chambers***, 878 F.3d 616, 622 (8th Cir. 2017) (per curiam). Determining what conduct is relevant is "a factually intensive inquiry that is best left for district courts." ***United States v. Hogue***, 66 F.4th 756, 765 (8th Cir. 2023). The district court was in the best position to hear all the evidence. Overwhelming evidence at trial showed Baling conspired with others to unlawfully possess and transfer firearms. The district court neither clearly erred in concluding Baling trafficked firearms, nor erred in finding the enhancement applied.

Baling argues that the district court's upward variance of 195 months (guideline range 130–147 months) was an abuse of discretion. Upholding the upward variance, the district court stated:

. . . .   The sentencing factors in 18 U.S.C. Section 3553(a) I believe favor an above-guideline sentence.  The offense conduct in this case is extremely serious.  The defendant had a distribution amount of cocaine and a firearm in his possession when he was arrested.  The fact that the defendant is an armed drug dealer demonstrates his extremely dangerous nature and poses a serious threat to the public.  Even relative to his co-defendants and co-conspirators, this defendant is particularly culpable.

The defendant's personal history and characteristics are just as concerning.  The defendant is a member of a criminal gang that operates in drug distribution, unlawful weapons transfers, and street violence.  The defendant's criminal history began when he was 13 years old . . . .

In 2013, the defendant, age 16, and other gang members were involved in -- I believe the PSR said 29 armed robberies. . . .  Despite having received a prison sentence of eight to ten years for this conduct, the defendant has not shown any proclivity to better himself or lead a law-abiding lifestyle, as this case demonstrates.

The [2021] guideline range . . . is in my judgment insufficient to deter this defendant and others who would commit these same crimes.

The Court further notes that the defendant appears to have no remorse for what he's done.  The defendant has failed to take responsibility for anything and that's why he doesn't get credit for any acceptance of responsibility here today.  I don't believe Mr. Dat has any respect at all for the law.

Finally, as I noted, the defendant's guideline range would have been higher had it been calculated using the most recent version of the guidelines manual.  That's because the authorities in power actually believe the guidelines from 2021 are insufficient so they changed them and today he'd be faced with a higher guideline sentence.

. . . .   Although I have -- I have properly calculated the guidelines using the 2021 guidelines manual and I've properly calculated them and I am considering those, I will note that, the most recent guideline changes also illustrate that those who calculate the guidelines even thought the

guidelines weren't sufficient, and I don't think they are either so I happen to agree with them. . . .

Baling, in part, argues that the district court violated his rights under the *Ex Post Facto* Clause for considering the higher 2024 guidelines. *See **United States v. Steward***, 880 F.3d 983, 985 (8th Cir. 2018) ("[W]hen the Guidelines have been amended since the offense occurred such that application of the new Guidelines results in a higher sentencing range, the court should apply the Guidelines in effect at the time of the offense, so as not to violate the *Ex Post Facto* Clause."). The district court, however, *can* use the newer guidelines as a reason "for deviating from the older Guidelines," so long as it started with the correct, older guidelines. ***Peugh v. United States***, 569 U.S. 530, 549 (2013) (emphasis removed). *See **California Dep't of Corr. v. Morales***, 514 U.S. 499, 505 (1995) ("[T]he *Ex Post Facto* Clause forbids . . . enhanc[ing] the measure of punishment by *altering the substantive 'formula'* used to calculate the applicable sentencing range." (emphasis added)). The district court's upward variance did not violate the *Ex Post Facto* Clause.

Baling asserts that the district court abused its discretion in weighing the sentencing factors. "A district court abuses its discretion when it '(1) fails to consider a relevant factor that should have received significant weight'; (2) 'gives significant weight to an improper or irrelevant factor'; or (3) 'considers only the appropriate factors but in weighing those factors commits a clear error of judgment.'" ***United States v. Peithman***, 917 F.3d 635, 653 (8th Cir. 2019), *quoting **United States v. Feemster***, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). He argues that the district court exaggerated his criminal history and the seriousness of his offenses. He also asserts that considering his lack of remorse was impermissible. These arguments fail. *See **United States v. Wilson***, 122 F.4th 317, 325 (8th Cir. 2024) (The district court's "weighing of certain sentencing factors more heavily than others does not amount to an abuse of the district court's broad sentencing discretion."); ***United States v. Spratt***, 141 F.4th 931, 939 (8th Cir. 2025) ("[D]isagreement with how the district court weighed the various sentencing factors, alone, is not enough to show an abuse of discretion." (cleaned up)); ***United States v.***

*Sevilla-Acosta*, 724 F. Appx. 510, 511 (8th Cir. 2018) (per curiam) (stating district courts can consider a defendant's lack of remorse for sentencing); *United States v. Parker*, 762 F.3d 801, 812 (8th Cir. 2014) ("The sentencing judge's responsibility is always to fashion a punishment particular to each defendant, recognizing 'the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'"), *quoting **Koon v. United States***, 518 U.S. 81, 113 (1996).

Finally, Baling argues his sentence is substantively unreasonable. Reviewing the substantive reasonableness of a sentence for an abuse of discretion, this court "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Feemster*, 572 F.3d at 461, *quoting **Gall v. United States***, 552 U.S. 38, 51 (2007). "[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." *Id*. at 464 (citation omitted). Reviewing the totality of the circumstances, Baling's sentence is not unusual. The district court's sentence clearly reflected Baling's criminal history, lack of remorse, lack of respect for the law, the seriousness of the offenses, and the risk he poses to the public as an armed, gang-affiliated drug dealer. The district court did not abuse its discretion in imposing its upward variance.

The district court properly sentenced Baling.

B.

The district court sentenced Dilang to 120 months in prison for possessing a firearm as a prohibited person. Dilang argues that the district court erred in applying an enhancement, and in denying his request for a downward variance. He also challenges the substantive reasonableness of his sentence.

Dilang argues that the district court erred in applying a four-level enhancement for the use or possession of a firearm for another felony pursuant to

U.S.S.G. § 2K2.1(b)(6)(B).[4]  Like his brother, he challenges the district court's evidentiary findings.  This court reviews for clear error.  *See United States v. Bullock*, 35 F.4th 666, 670 (8th Cir. 2022).

Section 2K2.1(b)(6)(B) provides:

> If the defendant . . . used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels.

Dilang asserts that the jury convicted him only of being a felon in possession and not of "another" offense.  "'Another felony offense,' for purposes of subsection (b)(6)(B), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained."  **U.S.S.G. § 2K2.1 cmt. n. 14(C) (2021)**.  "[T]he plain language of application note 14(C) *excludes only the underlying firearms possession offense of conviction* from the definition of 'another felony offense.'"  *United States v. Hemsher*, 893 F.3d 525, 535 (8th Cir. 2018) (emphasis added).

"In applying § 2K2.1(b)(6) when the defendant has not been convicted of another state or federal felony offense, the district court must find by a preponderance of the evidence that another felony offense was committed, and that use or possession of the firearm facilitated that other felony."  *Id*. at 534.  "The government bears the burden of proving facts to support a § 2K2.1(b)(6)(B) enhancement . . . ."  *United States v. Mitchell*, 963 F.3d 729, 731 (8th Cir. 2020).  At sentencing, the government argued that the evidence at trial supported a finding

---

[4]Effective November 1, 2025, the guidelines provide this enhancement at U.S.S.G. § 2K2.1(b)(7)(B).  This court references the version of the guidelines— § 2K2.1(b)(6)(B)—used to determine Dilang's offense level at the time of sentencing.

that Dilang was involved in a conspiracy to unlawfully transfer firearms. It emphasized that the Ruger-57 handgun attributed to Dilang was found with two magazines, which contained the same ammunition found in Jock's backpack. It also highlighted Exhibit 128's conspiracy evidence, and Pan's testimony that he provided the Ruger-57 to Jock.

Justifying the enhancement, the district court stated:

I'm gonna conclude that the evidence overwhelmingly shows that the defendant is a member of a gang that engages in drug and firearm distribution as well as street violence. Indeed, there was cocaine and numerous firearms in the defendant's home when he was arrested.

As the Court determined at trial, there was a conspiracy, which the defendant was a part of, to unlawfully share or transfer firearms. The text messages, the -- Mr. Pan's testimony, the evidence at trial really doesn't make this a close call, quite frankly. So -- and there's photos located on -- on the cell phones as well. And the defendant's text messages also support all this.

So the government has established the propriety of the enhancement by a preponderance of the evidence. . . .

I note that even if I had ruled differently on any of the defendant's objections, I would still have imposed the same -- same sentence in this case that I am about to impose . . . .

The district court did not clearly err in finding that Dilang used or possessed the Ruger-57 "in connection with" the conspiracy to unlawfully possess and transfer firearms, and thus properly applied the enhancement.

Even if the application of § 2K2.1(b)(6)(B) were in error, it was harmless because the district court stated it would have imposed the same sentence without the enhancement. *See United States v. Straw*, 616 F.3d 737, 742 (8th Cir. 2010) ("Incorrect application of the Guidelines is harmless error where the district court

specifies the resolution of a particular issue did not affect the ultimate determination of a sentence.").

Dilang's next challenge involves his citizen status. Dilang, a native of Kenya and a citizen of South Sudan, entered the United States as a refugee in 1995, becoming a lawful permanent resident two years later. According to the Presentence Investigation Report and Immigration and Customs Enforcement, after a 2014 robbery conviction, he lost his permanent resident status and now possesses only refugee status. An Immigration Judge ordered Dilang removed to South Sudan but granted him deferral of removal under the Convention Against Torture. ICE never commenced immigration proceedings after his release from prison in 2020.

In his sentencing memorandum, Dilang stated:

> I am a deportable alien based on my immigration status. On the basis of being a deportable alien, my individualized circumstances make my particular immigration status unusual, atypical, extraordinary, and rare compared to other deportable aliens, in that the U.S. Government is unable to enforce the removal order because of country conditions in South Sudan that warranted an immigration judge to grant me relief under . . . [CAT], and difference to law with the alternative country of Kenya unable to accept me as their citizen. Essentially I am a stateless person although I have been expelled by the U.S. Government.

> These individualized circumstances create a number of challenges. Relevant to sentencing factors, after I complete the sentence I will be released back into the community unlike other deportable aliens, and while serving the sentence I will be denied and excluded by the Bureau of Prisons from any opportunity to participate in certain pre-release programs. As a matter of policy I am ineligible from benefits of programs geared toward rehabilitating prisoners who will re-enter society after release from confinement.

> The manner in which my sentence will be impacted is another factor. As experienced during my first sentence . . . I anticipate the Bureau of Prisons will require me to serve the full sentence impose (aka jam the number) when I get denied earned time credit under the First Step Act,

-37-

six months of community-confinement (aka half-way house assignment), and participation in Evidence Based Recidivism Programs . . . under the [FSA] which afford prisoners a reasonable opportunity to adjust to and prepare for re-entry into the community. This creates a lengthy sentence and increase in the severity of the conditions of confinement.

(footnotes omitted). Dilang believes that the risk of serving his entire sentence entitles him to a downward variance. He requested an 18-month downward variance "to address [the] undeserved increase in the length of his term of imprisonment."

The district court disagreed:

Well, I do not intend to vary downward in this case because a downward variance would be inappropriate. The defendant was convicted by a jury of his peers for illegally possessing firearms. The defendant is a member of a violent criminal street gang and the defendant has a criminal history that includes burglary and robbery charges. The case is not outside the heartland of cases to which the Commission intends the individual guidelines to apply such that a downward variance would be appropriate. So in other words, I think certainly a downward variance is not appropriate in this case. So the motion for downward variance is denied.

Dilang argues that the district court clearly erred because "the evidence in support of his request was uncontroverted." However, the district court sufficiently explained its denial, basing it on Dilang's criminal history and the seriousness of the offense. In light of the record, the district court did not abuse its discretion in refusing to grant Dilang a downward variance.

Dilang argues that his sentence is substantively unreasonable. The district court issued an above-guideline sentence of 120-months in prison (guideline range 78–97 months). Upholding the upward variance, the district court stated:

I do intend to vary upwards in this case. The sentencing factors under 18 U.S.C. Section 3553(a) favor an above-the-guideline sentence. The

offense conduct in this case is serious. The defendant illegally possessed a firearm as a prohibited person. This demonstrates that the defendant is dangerous and poses a serious threat to the public.

The defendant's personal history and characteristics makes this case even more concerning. The defendant has committed and been incarcerated for robberies while armed with a firearm. As mentioned, the defendant is a member of a gang that operates in drug distribution, unlawful weapon transfers, and street violence.

The defendant's criminal history began when he was 13 years old and committed a burglary. In 2014, when defendant was age 21, he and other gang members were involved in multiple armed robberies . . . . Despite having received a prison sentence of 78 months for this conduct, the defendant has not shown any proclivity to be a law-abiding citizen, as this case demonstrates.

A guideline range of 78 to 97 months is insufficient to deter this defendant and others who would commit the same crimes. I do deem Mr. Dilang Dat as extremely dangerous to the public.

The Court further notes that the defendant appears to have no remorse for what he has done. Despite overwhelming evidence, the defendant has not taken responsibility for anything he's done. I believe Mr. -- Mr. Dilang Dat does not have respect for the law.

The district court's sentence is not unreasonable. "In varying, a district court is permitted to consider whether the guidelines range adequately reflects the seriousness of the offense, affords adequate deterrence, and protects the public." *United States v. Ross*, 29 F.4th 1003, 1008 (8th Cir. 2022) (cleaned up). *See United States v. Michels*, 49 F.4th 1146, 1149 (8th Cir. 2022) ("We have repeatedly held that it is not unreasonable for a sentencing court to demonstrate with an upward variance that contemptuous disregard for our laws can have serious consequences.").

## C.

Dilang was under supervised release during his new law violation in this case, resulting in a revocation. "If a defendant violates the conditions of supervised release, the district court may impose both a term of imprisonment and a further term of supervised release . . . ." *United States v. Newcomer*, 164 F.4th 697, 699 (8th Cir. 2026) (cleaned up), *quoting United States v. Palmer*, 380 F.3d 395, 398 (8th Cir. 2004) (en banc). Finding a violation, the district court imposed an above-guideline revocation sentence of the maximum 24 months in prison (guideline range 12–18 months) to run consecutive to the 120-month term of imprisonment. Dilang argues that his revocation sentence is substantively unreasonable. "A supervised release revocation sentence is reviewed under the same deferential abuse-of-discretion standard." *Michels*, 49 F.4th at 1148 (quotation omitted).

The district court did not abuse its discretion by imposing an above-guideline revocation sentence. Justifying the revocation sentence, the district court stated:

> In crafting this disposition, I have considered all the factors referenced in 18 U.S.C. Section 3583(e), including general deterrence, specific deterrence, protection of the public, the need to avoid unwarranted sentencing disparities, and the specific history and characteristics of the defendant.

> The Court has also considered the nature of the violation.

> . . . .

> I will just note for the record this is an upward variance, I believe, and that is justified by the facts of this case and the reasons I stated on the record under the prior filing. Just namely the dangerousness of the defendant and the factors I'm -- that I'm required to consider easily in my view justify an upward variance on the sentence in this case so that is my judgment.

The district court considered the proper factors and sufficiently explained the upward variance. The district court did not abuse its discretion.

The district court properly sentenced Dilang.

\* \* \* \* \* \* \*

The judgment is affirmed.

KELLY, Circuit Judge, concurring and concurring in the judgment as to Part IV.B.

Federal Rule of Evidence 1006 permits admission of summaries, charts, and calculations to prove the content of voluminous admissible writings or recordings. But Exhibit 128 was not a summary, chart, or calculation. Rather, it was a compilation of more than 70 separate pieces of data, selected and extracted from the defendants' cell phones that included excerpted text messages, emails, photos, location data, and internet searches. Nearly every slide displayed a message or internet search and included red circles around specific text—added by the government—directing the jury's attention to particular entries on the slide. Selected text messages were rewritten in larger font to the side of the image, with the message's sender identified.

No one disputes that the evidence obtained from the multiple cell phones in this case was voluminous,[5] and each of the individual slides may have been admissible as a standalone exhibit. But rather than offering an abridgment or condensed description of the contents of the defendants' cell phones, here the government compiled a select number of images and messages that best supported its theory of the defendants' liability into a single exhibit, with annotations directing the jury to the most damning evidence. Such an exhibit goes beyond the bounds of Rule 1006. United States v. Oloyede, 933 F.3d 302, 310–11 (4th Cir. 2019)

---

[5]The government represented that the combined reports included gigabytes of data. Yet, one defendant's counsel stated that it may have been terabytes, and another told the court that she and the prosecutor both crashed their respective computers attempting to download the cell phone data in its entirety.

("[Evidence admitted under Rule 1006] must be an objectively accurate summarization of the underlying documents[.]"); see also Summary, Black's Law Dictionary (12th ed. 2024) (A "summary" is an "abridgment or brief."); Fed. R. Evid. 1006.

Concern regarding the admission of Exhibit 128 is amplified when, as here, the government waited until the evening before trial to notify the defendants which portions of the significant volume of cell phone data it planned to offer into evidence by way of this exhibit. The Cellebrite reports had been turned over to the defendants well in advance of trial, so all parties had the "voluminous" underlying data. Even after getting an extension to file its exhibit list up to seven days before trial, however, the government's list described Exhibit 128 simply as "PowerPoint re. extractions of all 3x phones." The government then waited until the night before trial to notify the defendants which "extractions" from the cell phones it planned to include. Framing Exhibit 128 as a summary therefore allowed the government to submit it on the eve of trial, rather than a week before in accordance with the court's scheduling order.

But the admission of Exhibit 128 is not reversible error here, because it was harmless. Each slide of Exhibit 128 was almost certainly otherwise independently admissible. And although the district court admitted the slides as a single exhibit, it allowed the defendants to object to specific slides and sustained several of those objections. For these reasons, and in light of the other evidence admitted at trial, admission of the slides in this form did not materially affect the verdict.

As to the "general gang evidence" offered by Ullery, I share the court's concerns. But it is a very close call. The testimony here was that Trip Set gang members were involved in "[r]obberies, home invasions, burglaries, narcotics trafficking, gun trafficking, felony assaults, homicides, [and] thefts"—crimes that went far beyond the charged offenses in kind, volume, and severity. Ullery also explained that Trip Set operated in several "pockets within the Omaha metro area," including the areas near "27th Street west to 30th, R Street south to W," "Northwest

-42-

Radial west to about 50th Street, Cuming area north to roughly Hamilton," "65th and Lafayette," "44th to 47th and Ellison Avenue area," and other pockets in North and South Omaha. Combined, this testimony presented Trip Set as dangerous, not only to its members and other gangs, but to people in general all over Omaha. In this way, it is very similar to the type of evidence we have found prejudicial, reversible error. See Roark, 924 F.2d at 1432–34 (finding reversible error when government elicited testimony by two agents describing the Hells Angels and its extensive network of chapters engaged in methamphetamine and cocaine production and distribution), and Street, 548 F.3d at 629–34 (finding reversible error when, "[o]ver Street's objection this government witness was allowed to provide extensive, prejudicial testimony concerning the violent tendencies and criminal dispositions of gangs in general and of the Kansas City El Forasteros in particular").

But, as the court fairly points out, the general gang evidence did not play a significant role in the overall case. Cf. Roark, 924 F.2d at 1432 ("The government began its assault on the Hells Angels organization in voir dire, and continued throughout the trial in a relentless attempt to convict Appellant through his association with the motorcycle club."); Street, 548 F.3d at 629 ("Half of [the expert's] testimony, spanning twenty pages in the record, is devoted to an alarming portrayal of gang culture in general and of the local El Forasteros gang in particular."). By contrast, Ullery's most prejudicial comments about Trip Set span about two pages of the trial transcript. The content of the testimony was undoubtedly prejudicial, but its brevity in the context of the record as a whole precludes reversal for plain error.

———————————————————